We will now start, we'll now hear argument in 20-6105 U.S. v. Thibeault, is that? That's correct, Judge Hartz. Mr. Illich, if you would proceed. Yes, may it please the court. My name is Niles Illich and I represent the appellant Sean Michael Thibeault. This is my first time before this court and I appreciate the opportunity to speak to the court. Ultimately, I'd like to reserve two minutes for rebuttal, but we will see how that goes. I recognize that the court has heard four arguments before mine and that this is made for a long morning. But with that in mind, I think this court can resolve this case with a straightforward application of Bertine and this court's opinion in Sanders and find that the OBN policy or the Oklahoma Bureau of Narcotics Policy, which is in the appendix at pages 96 through 100, is deficient for failing to provide standardized procedures for impounding a vehicle. Then this court can apply common sense and operament in Sanders and find that the community caretaking function did not apply. At that point, this court must reverse the district court's decision. We've asserted four arguments and I don't anticipate getting to them all, but I think it's worth setting them out. First, we contend that the OBN policy was deficient. Second, we contend that the community caretaking function did not apply. Third, we contend that the impoundment was a pretext for a warrantless investigation. And fourth, we argue that the inevitable discovery rule didn't apply. Turning to our first argument, we established in the district court that the OBN operated without a standardized policy for impoundments and thus the impoundment was illegal. The policy allows that the agent's sole and alone discretion. Mr. Ehrlich. Yes, Judge Murphy. If we look at South Dakota versus Operman, isn't that what we should address first? Well, I think that this really starts with, Judge Murphy, I really think this starts with the context in this circuit. So it's how this circuit has addressed both Operman and Bertine. If we determine that the custodian, that taking the car into custody was appropriate under Operman, doesn't that end all standard, that you're providing your community caretaking? That's enough. Yes, Judge Murphy, that would be enough. And I think there are two answers to that, and I'd like to set them out sort of separately. I think the first is that we would do well to look to the district court's decision, and I don't think the district court really relies on the community caretaking exception. It really says that it finds that the policy is sufficient, and that's really the crux and core of the district court's decision. So I think that's really where we begin. Judge Hartz. Well, I'm with Judge Murphy. I don't think that's where we begin. We don't need to worry about a policy if Operman's satisfied. We don't need a standardized policy if Operman applies, and we've always applied Operman when we've stopped a vehicle on the roadway. I don't... Go ahead. No, forgive me, Judge Hartz, I'm too anxious here. So I think just recognizing, number one, that's not what the district court relied on is the first thing. But the second thing is to go to Operman, and I think we can look to Operman, and I would again say that it would happen in the context of the Sanders case, 2015 case out of this court, but let's just get to the nuts and bolts of an application of Operman. And I think it becomes fairly simple here. Operman says, basically, that an impoundment is allowed if a vehicle poses some sort of immediate threat or threat to the vehicles around it, or it poses a threat to the traffic. It's impeding traffic. When we look at the facts in this case, there is nothing more than a theoretical threat to this, to the traffic around it. It's no greater than, say, a concrete post. Judge Hartz? Before you look at the facts here, look at Operman. You had a car parked in a legal parking space, but it was over parked. That was sufficient to justify impoundment. That was pretty minimal effect on traffic and safety. There was no imminent threat of danger in that case. It was a threat to the convenience. People would have to look further to get a parking space if there's one that's occupied too long. I would go to... I would explain that the way this court has handled this through Sanders is to say that there must be some risk or there must be some traffic impediment. And when we look at... But Sanders focused on a vehicle in a parking lot of a store that was parked in the private parking lot. Right. Yes. That's a different factual situation. Anything it said about other circumstances, that was not what was at issue in Sanders. So why don't we look at Operman? Sanders couldn't overrule Operman. You agree with that, don't you? I would agree with that, of course. And my... So don't use language from Sanders to say Operman didn't mean what it said. Okay. And Judge Hartz, if I may say Sanders one more time, what I'm saying about Sanders is when this court set out its opinion in Sanders, what it did is it said, here's Bertine, here's Operman. And yes, it occurred in the context of what I think it was a Goodwill parking lot, a private parking lot. But this court was reconciling what Bertine said and what Operman said. And I think it set out the standard that the district court should have used. But let's look at the facts here. Agent Hartzberg testified that appellant stopped at a safe place when he pulled over the side of the road. That's in the appendix at page 269 through 270. The OBN agents testified if they needed to move the car for safe purposes, they could have done so, yet they chose not to. That's at page 273. They kneeled next to the car with no problem. They were unconcerned about the black SUV that the... Judge Hartz? At the time they kneeled next to the car, you've got several patrol cars. I'd be awfully surprised if there weren't lights flashing to warn motorists. What time of day was it? Wasn't it in the morning? It was in the morning, yes. Yeah. So you're leaving a vehicle. How wide was the shoulder in this case? It wasn't a very wide shoulder. No, I think it was a sufficiently wide shoulder designed specifically, and the Oklahoma law sets this out, and the OBN agents testified, designed specifically for cars to pull over, stop safely. And that's exactly what happened here. They testified, the OBN agents testified that the car was parked safely on the side of the road. They passed a black SUV that they testified they had no concerns about the safety. It was parked in a very similar manner. If they'd had concerns about the safety of that car, they would have called the Oklahoma Highway Patrol. You can see that... You say they testified that the black SUV was not a safety problem? They testified to that. That's at page 279 through 280 of the appendix. I believe it was Agent Hartsburg who tested... The individual agent's name escapes me, but it's... Since defendant is being arrested, don't we have to consider the fact that the car would have been left there overnight in the dark? Well, yes, Judge... I'm sorry, go ahead. I just... Doesn't that make a difference? Well, I think it does make a difference, and that really goes to my argument about Bertine, and that is that you need a standardized procedure to decide whether or not to impound the car. So you don't just go and impound a car. So the policy here is that under any of these circumstances, it would be legal to impound a car, and they list them out in the policy. But the policy, the OBN policy, gives no direction on how the individual OBN agent should exercise their discretion on whether or not to tow the car. So certainly in this instance, they had the authority to tow the car, both under Opperman, under Oklahoma law, and under OBN policy, but they weren't required to. The policy says that they may do it. It's permissive. They're permitted to tow this car. Now, the question then becomes, how do they decide whether to tow this car or whether to tow another one? Judge Seymour's question of it, are they being arrested and it's being left overnight, could be a factor that goes into that. But as the courts in this circuit and the Supreme Court have said, there needs to be some discretion set out for the individual agent to make the decision whether or not to impound the car. And here, the problem is not so much that they had the lawful authority to impound the car, certainly they had the lawful authority to impound this car. That's the Opperman argument. They certainly had the authority to impound this car. The question is, is when they get to the discretion, to the point where they're trying to decide whether or not to impound the car, what guides that decision? And it's pretty clear here, agents are authorized to remove vehicles or cause vehicles to be removed when they have been discovered upon a road, et cetera, et cetera, and says, or the vehicles and let's see, agents are authorized to remove or cause vehicles to be removed when the operator of the vehicle has been physically arrested and the vehicle would be left unattended in a public access area or public way. What would be a good one for you? That good. OK, Judge Hartz, I think there are two things there. First of all, that is permissive. It says you can do that. And I but there's no discretion, no explanation for how to do it. And I think we'll go ahead. I'll tell you what we've criticized is when there's no discretion allowed that so that the officers have to do it, even if there's another person, maybe the registered owner is a passenger in the car and says, look, I can drive it all. You'd have to seize it. Is that what you want, something that gives no discretion? No, I think that I think that there should be discretion. And I think that the place that we go to to find this discretion really is to Chief Justice Rehnquist's majority opinion in Bertine and really to footnote seven of it, which doesn't get nearly as much attention as the rest of the opinion. And the chief judge at that point is discussing and describing the Boulder County impound policy in response to the dissenters. And what he what judge what Chief Judge Rehnquist is saying is, look, there are factors that what he calls circumscribes the discretion of the individual officers and what and I'm trying to get to your question. But those factors are things such as risk of vandalism. These are written policies for the Boulder County police risk of vandalism and whether the arrestee consents to locking and leaving the car. Those are the types of factors that Chief Justice Rehnquist and presumably the majority of the Supreme Court was saying should be in the policy to guide the discretion of whether or not to take the car. So if it's not an Opperman case, you're saying. No, I think even if it is an Opperman case, certainly in Opperman, they have the discretion. That's contrary to our decision, the one you're relying on. Sanders Sanders distinguishes, it says in Opperman cases, we don't need standards. It makes that very clear. It's setting out. It says the Opperman cases, the Bertine cases, and now we have a different sort of case. Well, I think what what Sanders says is that there are clear cases where the car has to be towed. That is a case where, say, a car gets in a wreck in the middle of the out or it's been or it's unlawfully parked for too long. Well, or it's a danger to others or you don't you can't ignore the facts in Opperman. That really tells us something about what the Supreme Court had in mind. Are you aware of any case where there wasn't a pretext issue where cars stopped on a way? No, I can't identify. I don't know a case where that came out. But again, what I'm trying to direct the court back to and what my argument really turns on is that is that, number one, if they're going to have the discretion to tow the car, if they're going to tow the car, they've got to have a policy to do it. When we look at the facts here, this is not a clear Opperman case. This car doesn't pose a clear threat to anybody. It's parked on the side of the road in what all the evidence says was safely. It is not. Now, the government wants to talk about the Horn case. The Horn case is different. They pull off to the side of the road and then they pull in at an angle pointing back into the road. That was a clear Opperman case, right, where where the cars coming from behind couldn't see the reflectors. Presumably here, this car is parked parallel in a safe spot. And all the evidence establishes that that is an appropriate and proper spot. And if it wasn't, the OBN agents had every authority and every opportunity to move it. Everyone felt comfortable with it there for over an hour. So it is not, in my mind, a clear Opperman case. I think we can look at Opperman, but Opperman really should apply to cases where things are much clearer. An accident in the middle of the road, a case like Horn where they're pointed back in and you can't see it coming from behind. This is a lawfully parked, stopped car on the side of the road that can be seen. What about circumstances where there are, it's undisputed, they're very valuable pieces of property that will be left in the car on the side of the road? Does that make a difference? Well, Judge Murphy, I think there are two parts to that. Number one, it it it would it certainly could make a difference. That certainly, I don't think it fits into Opperman clearly, but it is one where they would then have the, they would want to make an inventory to protect themselves. The police would want to make an inventory to protect themselves. The defendant himself, do I have the wrong case? No, no, no. You have exactly the right case, Judge Murphy. Yes. $20,000 pieces of art. But he made that after, and if I may finish the question, I see I'm out of time, but he made that, he made that claim after the decision to search his car had already occurred. So he's in the back of the car, police car screaming while they're searching his car. They made a mistake before. Didn't that verify that their mistake was harmless? No, I don't think so. I think by that point they'd found the money. They, they were going on a search. Uh, I don't think that changes anything. The decision had already been made to search the car. And, uh, that was where the error was. The impound error occurred before that. Any other questions? Thank you, Mr. Um, Mr. Snyder. Thank you, Your Honor. Um, if it pleases the court, my name is, uh, Thomas Snyder. I'm an assistant U.S. attorney appearing on behalf of the United States in this case. Uh, to pick up on a few things that, uh, my defense counsel argued. Um, I think the court is exactly correct that this is an Operman case. And if the court concludes that Operman applies, there's no need to really go any further on the issue of the impoundment. Um, I disagree about, uh, the contention that the district court did not make a finding that this was an Operman case. I'm looking at page 201 of the record, page three of the district court's opinion. The sentence I'm going to quote part of it says the court finds the agents were justified in concluding that the car needed to be impounded as a potential safety hazard if left on the side of the highway. Uh, so she did specifically make a finding that this was in fact an Operman case. Uh, now there's a couple, uh, factual things I want to address that were, were argued by counsel. The first is the idea that agent Hartsburg testified that this car was in a safe place. On page 270 of the record, the question that was actually asked was, uh, and I'll just quote this briefly. Is that where you pulled over even with your tires on the unimproved shoulder is a safe place, correct? Answer. It was a safe place for my stop. Yes. So the actual answer agent Hartsburg gave was not that this was somehow a safe place for all purposes. Um, but that this was a safe place for him to conduct the traffic enforcement action he was planning, which again, as the court noted, involved multiple police cars with lights flashing in the middle of the day. So it being a safe place for that particular purpose does not mean that he had somehow concluded that that was a safe place to leave the car overnight.  Uh, the second thing that I want to point out is that, uh, the, uh, the case that we're looking at here, uh, is a case that's a little bit more complicated than they were in Oprahman. Um, you had a, a, a plate, a vehicle with Tennessee license plates, uh, that was being driven by a person who lived in Tennessee, by all accounts. He had an extradition warrant out of the state of Montana for which he was being arrested. Uh, there is no indication that anyone involved, the agents had any reason to believe that Mr. Tebow would ever be in a position to do anything with that car for some considerable period of time. Uh, for all they knew he was going to Montana would appear on criminal charges there. So as the driver and sole occupant of the car, that car was going to be abandoned on the side of interstate 40. And I think that's where Horn comes in, in that, you know, I, it almost seems like the, the court in Horn, it was just so blatantly self-evident that the car parked on the side of a highway is a potential risk to public safety, uh, when they reached that conclusion, it was almost like, of it is a risk to public safety. Uh, there is nothing in the Horn opinion that indicates that the angle of the car was somehow determinative of that, that decision or that, that conclusion that they reached. The angle of the car is only mentioned in connection with an issue about whether or not the officer himself was justified in sort of being a little more concerned because it was parked in a strange way. So when he approached the car, he, he took more caution. Uh, it aroused reasonable suspicion that something was going on because it was an odd way to park it. Uh, there's no indication that somehow that angle is what made it a threat to public safety. And certainly if Oberman concludes that a car, while if we parked on a street is a danger, there's really no, uh, reasonable basis to conclude that the car here was, was, uh, uh, was not, it wasn't reasonable for them to conclude it. Um, the second argument that was made is about this black SUV. Um, and I want to, I do want to, uh, the allegation was made that agent Hartsburg testified that they had no concerns about that car being a safety risk, but I'm looking at page 279 of the record, um, and what, uh, the question was asked, did you ask agent English to make a phone call to have a sheriff or local PD come out and investigate that vehicle answer? No, I did not. I don't know what, I can't testify to anything about that vehicle because I don't know anything about it. That was the actual testimony below. Uh, not that he has somehow observed it, saw it, believe that it was safe. And therefore that could have been somehow, uh, I think used as, as evidence that his decision to impound Mr. Thiebaud's car was pretext. Uh, and on the pretext issue, uh, the district court below heard all of the same evidence that was argued by the appellant, uh, in their brief and all the arguments that are presented here. And nevertheless made the defining that I quoted earlier that the officers were justified in concluding that that, uh, car was a public safety risk and needed to be impounded. Uh, and implicit, at least in that finding, I think, which is entitled to deference and clear error review is the finding that the proffered reasons and the credibility of the officers was accepted as true by the district court. And they found that that proffered reason was justified. Otherwise, uh, the determination that they were justified in telling it would make no sense. So having concluded all that, I don't think we even need to reach the standardized policy. Uh, if we do need to reach the standardized policy understanders, I think the decision to impound is just. Before you go there, Mr. Schneider, on this black SUV, was there any evidence about why it was pulled over, whether it was just momentarily pulled over temporarily or what? The only evidence is from the dashboard camera. And what all you see is that as agent Hartsburg is going to complete the second stop, as he's driving to catch up with Mr. Tebow on the highway, uh, they pass a car that's parked on the side, on the highway, at least in a similar position to Mr. Tebow's car when it was ultimately stopped. But that's literally all, you know, there could have been someone in the vehicle. It's difficult to tell. So that, and that was the only time this black SUV showed up? Yes. You'll see it briefly as his agent Hartsburg is driving by. As far as we know, five minutes into the stop, the SUV was gone. I'm sorry, what? As far as we know, five minutes into this stop, the SUV was gone. It's certainly a possibility. And again, the testimony of agent Hartsburg was he couldn't provide any information because he didn't know anything about that car. The OBN hadn't stopped it. Does the camera show another car pulling over to the side in response to the lights? If a cop is chasing another car, I might pull over, uh, to the side to not get in the way, or maybe because I think I'm ordered to, is, does the camera show anything along those lines? Um, not with respect to the black SUV, but more generally, as he's going to make the second stop, there are cars yielding to the right as agent Hartsburg passes on the left, and then when the stop happens, you can observe most of the traffic, not all of it. Most of the traffic is passing at least a lane away from the lane of traffic that would be right next to the stop. And that is in accordance with Oklahoma law, and it's just standard driving practice to avoid, again, the clear hazard that was marked by the three police cars with their lights on. Did the officer activate the overhead lights, any lights, to pull over Mr. Thiebaud? I believe the testimony was he did. And I think you can see it in the camera, um, in the back of Mr. Thiebaud's car, you can see the reflection of the flashers. Um, as to the valuable art, uh, is that just irrelevant because there'd already been a determination to take the vehicle into custody at the time they discovered that? I don't think it's irrelevant. Um, I think if there was some lingering question about whether impoundment was, was appropriate or frankly, in response to the allegation that the inventory took too long, which is one that was made, um, I think it's relevant, certainly in those contexts, once someone indicates, uh, you know, for example, if the argument had been made that you didn't need to impound it cause you could have just left it there because the owner was okay. Uh, certainly the presence of very valuable, uh, items in the car heightens the very need to do the inventory search in the first place. Uh, it certainly justifies a thorough inventory at that point. And realizing this is not necessarily the facts, but it's a hypothetical. Is it assuming that the facts were such that there was, that, uh, Oberman didn't apply or there was a problem with Oberman, uh, and yet they determined to take the car into custody, uh, before finding out about the art, uh, after having found out about the art, does that make the initial determination if it was error to be harmless error? I believe it would. I believe it would. I certainly, I think, uh, the facts that develop after the initial stop, the initial stop was primarily to, uh, obviously arrest him on the valid outstanding warrant that no one has contested. Uh, if those facts developed that there was a peculiar need to protect Mr. Tebow or the police from claims of lost or damaged items of that, of that at that point. Okay. I can't recall verse and phrase from your briefing. Did you rely at all on this valuable art being sitting at the side of the road for a long time as, uh, some justification for taking this vehicle into custody? We did not argue, uh, the existence of the art being grounds for impoundment. And we argued it in context of responding to the claim that the inventory was too long time to do it. That was the only context in which we raised it. Um, and your honor, if, if we do have to get in just briefly, if we do have to get to the written policy of OBN, uh, as the court pointed out, um, it specifically calls out that impoundment for non investigatory reasons, which is what this was, is generally justified if supported by public safety concerns, danger, theft, or potential harm or vandalism if left unattended. Uh, and when you read through the policy and the specific circumscribed circumstances in which impoundment is authorized and, and the one circumstance in which it is specifically outlined, uh, I can't shake the feeling that this was written specifically with the 10th circuit precedent in mind, those are the types of community caretaking functions that Sanders looks to find in a situation where the sort of automatic impoundment, uh, that's, that's found in Oakerman does not apply because there you have to have a standardized policy. And some argument that community caretaking function supports it. And so the policy seems to be tailored directly to, to match what has been permitted by the court. And I think it's totally consistent with that. And the fact that it has some residual discretion within limited categories that for the agents to exercise does not make it so, uh, uh, uh, doesn't, doesn't render it illusory, I guess. And it's guidance for agents working in the field who do have to deal with changing circumstances. It is a sufficiently, and it's a reasonable policy for fourth amendment purposes, so I think the impoundment is, is, is fine either way. Okay. D-d-d-disclaiming any obsession I have with this art, uh, does the, the art have anything to do with the, uh, inevitable discovery issue if you need to go on to that, uh, I, I do believe it does, uh, it does have some role to play in that. Um, once that declaration has been made that there's something of that magnitude that's in the car, and I think the district court made this observation in the ruling as well, uh, that it changes the circumstances a little bit as, as opposed to sort of a standard, uh, roadside inventory where you wouldn't expect to find a valuable art in a car that's just stopped on the highway. So, um, in that context, I think, uh, if there was some issue or there was some traction to any of the complaints made about the manner in which the Mr. Thiebaud hasn't waived those in a legal sense, but he's essentially relinquished his right to really make the argument, uh, because at that point, a very thorough search of some kind or an inventory rather was required to, in light of his claims, uh, they found money they'd found, you know, he'd made these allegations. I think at that point, the type of search that you're allowed to envision for inevitable discovery would have located the, the suitcase, uh, you know, the giant suitcase filled with the cocaine in the trunk of the car. Certainly a valuable art could have been concealed in that type of a container. Not the smartest thing for someone stopped on the highway to talk about if they're carrying drugs. I would editorialize. It's, it's something someone says when they're desperate to have someone not find the cocaine in the trunk of the car. Um, I'm happy to address other questions. Otherwise I'm happy to give back my remaining time. Any further questions? Thank you very much. Counsel, nicely argued. Case is submitted. Counselor excused.